| | |
|---|---|
| **MIKE FORADORI, GUARDIAN OF THE PERSON AND ESTATE OF MICHAEL FORADORI, JR.** | **PLAINTIFF** |
| **V.** | **CASE NO. 1:03cv669** |
| **CAPTAIN D'S, LLC** | **DEFENDANT** |
| **VS.** | |
| **CASTLE & ASSOCIATES, JIM WALTER HOMES, INC., JOHN DOES 1-10 AND XYZ CORPORATIONS 1-10** | **THIRD PARTY DEFENDANTS** |

_____

## ORDER

This cause comes before the court on defendant Captain D's motion for judgment as a matter of law or alternatively for new trial and/or remittitur.  Plaintiff has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion is not well taken and should be denied.

**I. Was the jury's verdict against the overwhelming weight of the evidence?**

In its prior order denying Captain D's motion for directed verdict/judgment as a matter of law,[1] this court set forth in detail the facts which served to establish fact issues as to Captain D's negligence in this case. The court will not repeat that discussion in its entirety here.  The court

_____

[1] Judgment as a matter of law should be granted where "there is no legally sufficient evidentiary basis for a reasonable jury to find" as it did. Fed. R. Civ. P. 50(a)(1); *Hiltgen v. Sumrall,* 47 F.3d 695, 700 (5th Cir. 1995).  In ruling upon a motion for JML, the court draws all reasonable inferences and resolves all credibility determinations in the light most favorable to the nonmoving party. *Id.*

will, however, address Captain D's primary post-trial argument as to liability, namely that the jury's verdict was inconsistent with this court's ruling granting judgment as a matter of law to Captain D's as to plaintiff's vicarious liability claims.

Vicarious liability is a form of liability *without fault*, and this court's ruling absolving Captain D's of vicarious liability for Garious Harris' intentional assault upon Foradori merely placed the burden upon plaintiff to demonstrate that at least one Captain D's employee, acting in the scope of his or her employment, acted negligently in this case and that this negligence was a proximate cause of plaintiff's injuries. The jury found that plaintiff carried this burden of proof, and this conclusion was, in the court's view, supported by the evidence at trial. In particular, there was substantial testimony at trial suggesting that manager Peggy King acted negligently in this case, and Captain D's does not dispute that King's actions were taken in the course and scope of her employment as a Captain D's manager. In denying directed verdict as to plaintiff's negligence claims, the court wrote as follows:

> [T]estimony at trial indicated that the assault in this case did not arise "out of the blue," but, rather, was preceded by a period of verbal confrontation between Foradori and Al Cannon, a Captain D's employee. Foradori testified that this confrontation was a loud one which should have been overheard by Captain D's management personnel, and the testimony at trial indicated that restaurant chef Jeremy Shell, who was in the kitchen area, overheard the verbal confrontation in the dining area and went out to witness what he believed would be a fight. Moreover, Captain D's manager Peggy King admitted at trial that she heard the verbal exchanges between Foradori and Cannon, and she further testified that she ordered the young men to take their dispute outside. King maintained that she only felt that "horseplay" was taking place between the young men, but she conceded that she did not investigate the matter further to determine the true facts in this regard. In the court's view, the aforementioned facts create fact issues as to whether, unlike the sudden assault in *Mays*, Captain D's management either knew or, in the exercise of reasonable supervision should have known, of the confrontation which was brewing in their restaurant.

2

In light of the foregoing, there were clearly triable fact issues in this case as to whether King was negligent and whether that negligence was the proximate cause of plaintiff's injuries.

The jury apparently chose to believe Shell's testimony that he went outside the restaurant with the full expectation of seeing a fight. Specifically, Shell testified that:

> I seen a crowd of people go outside and they was already in the store arguing so the next thing in my mind was, hey, they fixing to fight. So I went out behind them.

Shell also testified that, prior to the young men going outside, he could hear "loud voices" in the restaurant which clearly indicated to him that an argument was taking place. With regard to Harris' assault on Foradori, Shell testified that while Cannon and Foradori were facing off outside:

> I turned around and Garious come out of nowhere running full speed and hit Michael Foradori in the back of the neck ... that was a hard punch. I'm talking about a punch like I never seen before.

Assuming that the jury found this testimony to be credible, it could very reasonably have disbelieved King's self-serving testimony that she merely felt that innocent "horseplay" was taking place between Cannon and Foradori. Indeed, given that Shell, who was working in the food preparation area behind King, apparently managed to correctly perceive that a fight was brewing in the dining area a considerable distance away, King's self-serving testimony that she was unable to do so even though she was closer to the altercation can reasonably be viewed with skepticism.

Assuming that the jury made this very reasonable inference from the evidence, Captain D's arguments that Harris' intentional assault was a superseding cause as a matter of law likewise lacks merit. In the court's view, it is clearly foreseeable that a customer might receive

injuries from engaging in a fight with an employee, and Shell's testimony could have led a reasonable juror to conclude that King knew or should have known that her actions in ordering her employees outside (as well as her actions in not stopping the confrontation from brewing in the first place) would have resulted in a fight and possible injuries to Foradori. The mere fact that plaintiff's injuries were more serious than would generally be expected, and the fact that it was another employee who actually inflicted those injuries, make no difference as to the issue of foreseeability. Captain D's argued at trial that Shell's testimony was unreliable, but this was clearly an issue for the jury. This court considered Shell's testimony as to his reasons for going outside to be credible, in large part because young men typically do not rush outside to watch "horseplay" take place. Shell clearly left the restaurant for a reason, and his testimony that he did so to watch a fight seemed credible to this court. Shell's testimony was clearly damaging to Captain D's case, inasmuch as it cast doubt upon Captain D's argument that King had no reason to anticipate that a fight would occur.

The credibility of Shell's version of events was also enhanced by Peggy King's own testimony regarding her actions after the tragic incident in this case. The court found it extraordinary that King admitted that she made no inquiries whatsoever of her employees even after Foradori was left paralyzed by Harris' attack. King testified that she felt that it was the job of the police to investigate the incident, and this admission arguably speaks volumes regarding the level of discipline, and the degree of supervision, which existed between King and her employees. In the court's view, the jury could have reasonably concluded that a manager who admittedly failed to make basic inquiries after a fight involving grevious injuries to a customer would have been indifferent to whether that fight occurred in the first place. An inference of

negligence on the part of King was also supported by the fact that three separate Captain D's employees under her supervision (i.e. Cannon, Harris and Shell) behaved in such a grossly inappropriate manner on the night in question.  It is one thing for Captain D's to argue that the inappropriate actions of one employee were somehow an aberration, but the fact that three employees under King's supervision behaved in such an inappropriate manner reasonably supports a finding that a general lack of supervision and discipline prevailed at this particular restaurant.

In light of the foregoing, the court concludes that the evidence in this case not only supported the jury's finding that Captain D's was negligent, but that it did so strongly.[2]  Captain D's motion for JML and/or new trial based upon the sufficiency of the evidence will therefore be denied.

**II. Evidentiary/jury instruction issues**

**Evidence of marijuana usage**

Captain D's argues that this court erred in not allowing it to present evidence of plaintiff's alleged marijuana use on the night of the injury.  While this court originally, in a pre-trial ruling, found Captain D's arguments in this regard to be persuasive, the court eventually ruled from the bench that, while such evidence might well be admissible in a particular case, any

---

[2]In its post-trial motions, Captain D's notes the absence of any Mississippi cases involving facts similar to those in the instant case.  In the court's view, the absence of Mississippi case law dealing with similar facts is unsurprising, given that many defendants would have elected to settle prior to trial when confronted with facts as adverse as those in the instant case.  Moreover, the court would presume (and hope) that it is a fairly rare occurrence for a customer to be attacked in a violent manner by a restaurant employee.  The court has little difficulty in concluding, however, that there is not a single jurisdiction in the United States which would bar recovery for negligence based upon the facts present in this case.

probative value of such evidence in the instant case would be substantially outweighed by its prejudicial effect under Fed. R. Evid. 403. At the time the court made its final ruling in this regard, it had the benefit of having witnessed much of the actual testimony at trial. The court was of the view, after witnessing this testimony, that the probative value of any evidence of marijuana usage was far less than the court had originally supposed. In addition, after witnessing the actual trial testimony, the court was of the view that Captain D's would likely attempt to use the evidence in a much more prejudicial manner than the court had originally anticipated.

With regard to the probative value of the evidence, the court noted from the bench that the testimony at trial established that Foradori was hit from behind by an extremely violent blow delivered by Harris which rendered him immediately unconscious. When asked how Foradori looked when he was falling, Jeremy Shell testified that "he was unconscious. He wasn't - - he was unconscious. He got hit pretty hard. He didn't know what was going on." Foradori similarly testified that he was immediately knocked unconscious by Harris' blow, and there was no testimony to the contrary at trial. In light of this testimony (which the court did not consider in its original ruling), the proposed expert testimony of Dr. Fredrick Carlton that "the use of marijuana and the impairment that he had as a result of its use ... caused [Foradori] to not adequately protect himself" was of very dubious value. There was no testimony from any witness that Foradori was behaving in an impaired manner on the night in question, nor was there any physical evidence regarding the existence or extent of any intoxication of the sort which the Mississippi Supreme Court has held to be a necessary predicate for the entry of evidence of

marijuana usage.[3]

In light of the foregoing, the court has grave doubts regarding the reliability of Dr.

Carlton's proposed expert testimony, the crux of which was set forth in his deposition testimony:

> Q: Are you saying that this injury could not have happened to someone who
> wasn't impaired from the use of marijuana?
> Carlton: Certainly it could have happened to someone who was not impaired from
> marijuana. They could have been impaired from alcohol or some other substance.

Dr. Carlton would have this court believe that only an intoxicated individual who is struck from

behind in an extremely violent manner which causes him to immediately lose consciousness and

fall off a retaining wall could suffer a cervical spine injury. With all due respect to Dr. Carlton,

this proposed testimony does not pass the "straight face" test, and it most certainly does not pass

*Daubert* scrutiny. It is difficult to discern how an unconscious sober person might be able to

better protect himself than an unconscious intoxicated person, and the notion that Dr. Carlton

could purport to express certainty that an injury such as Foradori's could only be suffered by an

intoxicated individual causes this witness to lose all credibility in the eyes of this court. The

court therefore concludes that the proposed use of marijuana usage by Captain D's would have

been of virtually no probative value. Indeed, the court sees every possibility that this testimony,

---

[3]In *Accu-Fab v. Ladner*, 778 So.2d 766, 772 (Miss. 2001) (overruled on other grounds), the Mississippi Supreme Court applied a Mississippi Rule of Evidence 403 identical to Fed. R. Evid. 403. The Supreme Court in *Accu-fab* affirmed the trial court's exclusion of evidence of marijuana use, noting that no foundation was laid for the entry of the evidence, since there was no testimony from any witness that the plaintiff had been impaired at the time of the accident, nor was there any evidence that any drug concentration was sufficient to impair the plaintiff's motor skills. *Id.* The same can be said for the present case. The court would note that the present case does not present as close a call on this issue as *Accu-fab*, inasmuch as *Accu-fab* involved a plaintiff who had walked into a six-foot diameter hole during broad daylight, thus arguably providing some indication of impairment. In the present case, by contrast, there was no indication from any witness that Foradori was impaired on the night in question, nor did his behavior on the night in question raise an inference of possible marijuana use.

under the guise of expert testimony by a educated individual such as Dr. Carlton, would have affirmatively misled the jury in this case.

In addition, the court would note that the testimony at trial not only cast doubt upon the probative value of Dr. Carlton's proposed testimony, but it also gave the court grave concerns regarding whether Captain D's would attempt to use the evidence in an unduly prejudicial manner. It appeared to this court that part of Captain D's trial strategy was to attempt to denigrate the plaintiff in the eyes of the jury, including through the use of some irrelevant and highly questionable cross-examination. For example, one of the very first questions asked of Foradori (who is white) on cross-examination by Captain D's was whether his girlfriend was African-American. This question was clearly a low point at trial, and one must question Captain D's motivation for bringing this utterly irrelevant fact to the jury's attention.[4] In addition, Captain D's violated a prior order *in limine* of this court by inquiring into whether Foradori had run away from home prior to his injury. In light of the foregoing, the court has every expectation that, if it had permitted Captain D's to introduce evidence of Foradori's drug use, this evidence would have been used in such a manner that its prejudicial effect would have substantially outweighed any probative value. This point of error therefore lacks merit.

---

[4]Plaintiff complained of this question by Captain D's during a sidebar, and counsel for Captain D's offered no explanation as to why it was asked. The court sincerely hopes that the question was not an attempt to appeal to any bias against inter-racial dating on the part of one or more jurors. The court felt that, whatever the motivation for the question, the "horse had left the barn" and there was no effective remedy for it after the fact. However, the fact that this question was asked legitimately impacted the court's Rule 403 analysis of the admissibility of other potentially prejudicial evidence in this case.

**Feigenbaum's testimony**

In its motion for new trial, Captain D's once again raises the issue of plaintiff's expert witness Feigenbaum's testimony during trial. In the court's view, Feigenbaum's testimony plays a much more prominent role in Captain D's post-trial motions than it ever did at trial or, in all likelihood, upon the jury's verdict. Feigenbaum has many years of experience in the restaurant industry, and he did, in the court's view, provide some helpful expert testimony regarding restaurant management practices. It is true that Feigenbaum admitted during testimony that he was not an expert in restaurant training and that *some* of his testimony was largely a matter of common sense. Unlike Captain D's, this court can not fathom how either of these facts might entitle it to a new trial in this case. The court can only assume that the jury accepted Feigenbaum's admissions regarding the extent of his training, and the court clearly instructed the jury that:

> You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.

The court thus instructed the jury that expert testimony which was not based upon sufficient expertise or which was outweighed by evidence could be disregarded entirely.

As this court has previously explained, the evidence in this case, apart from any expert testimony whatsoever, could reasonably have led the jury to conclude that Peggy King acted negligently in this case. The mere fact that Feigenbaum offered his own common-sensical observations in this regard may not reasonably be used by Captain D's as a "shield" against liability. It appears to this court that Captain D's is seeking to use Feigenbaum as a "bogeyman"

of sorts, explaining why the jury found that it was negligent in this case. The court would submit that Captain D's greatest difficulty in this case was not with Feigenbaum's common-sensical observations, but rather with the evidence which quite reasonably led the jury, as a matter of its own common sense, to conclude that Captain D's acted negligently. This issue lacks merit.

**Per diem argument**

Captain D's argues that the court erred in not issuing the jury a cautionary instruction regarding plaintiff's alleged "per diem" arguments during summation. Even assuming *arguendo* that any improper arguments were made at trial, Captain D's submitted no such cautionary instruction for this court's consideration. This court carefully consulted with both parties, on the record, regarding all jury instructions which they proposed submitting to the jury. If Captain D's had submitted such a cautionary instruction, the court would have carefully considered reading it to the jury. Captain D's did not do so, however, and it may not now be heard to argue that the court erred in failing to issue an instruction which neither party requested. The court would also note that, while the $10 million awarded by the jury for pain and suffering was quite substantial, it represented merely a fraction of the $45 million which plaintiff requested that the jury award on summation for total pain and suffering and loss of enjoyment of life.

Captain D's specifically objects to the portion of plaintiff's closing argument wherein he requested that the jury award $25 million for loss of enjoyment of life, by multiplying $1100 per day in lost enjoyment of life by plaintiff's 22,995 days in remaining life expectancy. Captain D's might have a stronger argument on this issue if the jury had returned a verdict which awarded the requested $25 million for loss of enjoyment of life, but the jury instead awarded $10 million for

*total* past, present and future pain and suffering, including loss of enjoyment of life.  Plaintiff has clearly incurred a great deal of past pain and suffering, and he clearly will incur a great deal more suffering in the future.  Accordingly, it seems clear that any award for loss of enjoyment of life was a small fraction of the amount requested by plaintiff.  It is thus apparent that any error in this regard was harmless and was also waived by defendant's failure to submit a proposed cautionary instruction.

### Irrelevant prejudicial evidence

Captain D's argues that the court erred in admitting its training manual which admonished employees to never admit fault.  If Captain D's is embarrassed by the contents of its own carefully-prepared manual, this should not be the court's concern.  The training manual itself was clearly relevant in a negligent training case, and it would be unfair to permit Captain D's to defend based upon the helpful portions of its own manual, but to excise the portions of the manual which it finds to be unhelpful to its case.   Captain D's also argues that the court improperly admitted testimony of the post-accident conduct of its employees.   As noted previously, however, the court views Peggy King's testimony regarding her post-accident conduct, in particular her failure to make any inquiries whatsoever of her employees, as shedding considerable light upon her managerial style.  This issue therefore lacks merit.

### Failure to allow evidence of "family circumstances"

Captain D's next argues that this court erred,  in its ruling *in limine*, in prohibiting it from enquiring regarding relevant aspects of plaintiff's family circumstances, most notably

evidence indicating that plaintiff would not have gone to college.  In reality, this is precisely the sort of family circumstances evidence which this court permitted in its ruling.  Specifically, the court ruled as follows:

> Foradori has filed a motion *in limine* to preclude any mention of his "family history and circumstances" (including his having been placed in foster care and his parents' alleged drug use).  The court sees little if any relevance to this evidence, and any slight probative value which such evidence might have is substantially outweighed by its prejudicial effect under FRE 403.  The court will permit Captain D's to introduce evidence which might tend to establish Foradori's future earning potential (or lack thereof), but the court will take care that any such evidence has actual probative value in this regard and that it is not merely used to "smear" or denigrate the defendant in the eyes of the jury.

The court thus clearly permitted Captain D's to enquire into family circumstances evidence which had probative value as to future earnings potential, and Captain D's was free to request the admission of any such evidence at trial.  The court's ruling specifically barred evidence such as plaintiff having been placed in foster care and his parents' alleged drug use, both of which have little if any probative value in this case and great prejudicial effect.   It is ironic that Captain D's seeks a new trial on this issue, given that it violated the court's ruling of which it now complains.  Specifically, Captain D's cross-examined plaintiff regarding whether he had ever run away from home, a subject clearly covered by the court's ruling and one which bears no conceivable relation to his future earnings prospects.  This argument lacks merit.


### Authentication of medical bills

In its post-trial motion, Captain D's revives its arguments relating to the authentication of plaintiff's medical records.  The trial in this matter ground to a halt for almost two hours after counsel for Captain D's refused to stipulate to the authenticity of the medical bills sought to be

admitted by Foradori in the course of his direct testimony. The Fifth Circuit Court of Appeals has held that:

> A trial judge is correct in allowing physical evidence to be presented to the jury as long as a reasonable jury could decide that the evidence is what the offering party claims it to be. ... Any question as to the authenticity of the evidence is then properly decided by the jury.

*U.S. v. Casto*, 889 F.2d 562, 568 (5th Cir. 1989). Thus, the Fifth Circuit has held that authentication is a jury issue, and, in order to submit the issue to the jury, plaintiff was only required to make a showing which would allow the jury to conclude that his medical bills were authentic.

Plaintiff testified in open court that he had reviewed the bills in exhibit P12 and that they were, in fact, his medical bills. The Mississippi Court of Appeals, interpreting a rule of evidence identical to Fed. R. Evid. 901, has held such testimony to be sufficient to authenticate medical records in this state.[5] *See Cassibry v. Schlautman*, 816 So.2d 398, 403 (Miss. App. 2002). In addition, the court carefully reviewed the bills in chambers and found no basis whatsoever to conclude that they were not authentic; to the contrary they had numerous indicia of authenticity. The court has no doubt that plaintiff's testimony, combined with the court's review of the

---

[5]In addition, plaintiff notes in its brief that Miss. Code Ann. §41-9-119 is widely used in state court proceedings to permit the authentication of medical records. While the statute deals, on its face, with the evidentiary weight to be given to the evidence, it is this court's experience that it is often used to authenticate evidence as well. While the *Erie* doctrine provides that federal rules of evidence apply in federal court, it does not bar state statutes which are not inconsistent with federal rules. At any rate, the court deems the §41-9-119 issues to be an unnecessary complication in this case, given that the medical records were properly submitted to the jury under the previously discussed Fifth Circuit case law and defendant did not even attempt to raise any fact issues regarding their authenticity before the jury.

documents in chamber, was sufficient to create fact issues regarding their authenticity under the Fifth Circuit's *Castro* decision. The burden then shifted to Captain D's to provide the jury with some indication that, contrary to plaintiff's testimony, the medical bills in P-12 were not, in fact, authentic. Indeed, the court specifically asked counsel for Captain D's in chambers to provide the court with any indication or argument which it might have that the bills were not authentic. Defense counsel never did so, either in chambers or in open court.

In light of the foregoing, it seems clear that Captain D's failed to raise any genuine fact issues regarding the authenticity of the plaintiff's medical bills. In the court's view, refusing to agree to the authenticity of medical records is not the same thing as establishing fact issues regarding their authenticity, and the court would emphasize that these medical records could have been, and likely were, obtained by Captain D's prior to trial. It is this court's experience that, even in the smallest tort action, defense counsel will routinely issue their own subpoenas upon a plaintiff's medical providers, and the court can not fathom that defense counsel would have failed to do so in a case as important as this one. Captain D's has quite competent counsel who have defended this case in a very thorough manner. It would accordingly be surprising if Captain D's does not have, at this very moment, its own subpoenaed copies of the medical documents, the authenticity of which it persists in disputing. For this reason, this court felt, and feels now, that Captain D's raised this issue as part of its "take no prisoners" approach to this litigation, rather than based upon any genuine concerns regarding the authenticity of the records.

The court's skepticism regarding this point of error is heightened by the fact that Captain D's once again argues that, because ERISA provider Lane Furniture (which previously provided coverage to plaintiff through his father) paid for some of plaintiff's medical expenses, plaintiff

can not sue to recover these damages himself.  Captain D's assertion in this regard flies in the face of well-established Mississippi tort law, in particular the "collateral source rule," which permits recovery for medical expenses even where such expenses were paid by a health insurance provider.  The Supreme Court held in *Burr v. Mississippi Baptist Medical Center*, 909 So.2d 721, 728 (Miss. 2005), for example, that the collateral source rule in Mississippi provides that "[c]ompensation or indemnity for the loss received by plaintiff from a collateral source, wholly independent of the wrongdoer, as from insurance, cannot be set up by the [defendant] in mitigation or reduction of damages."  Thus, the fact that insurance paid for some of plaintiff's medical bills may not even serve to reduce plaintiff's damages, much less preclude him from suing to recovery them.

    The fact that Lane has an ERISA lien on any recovery by plaintiff merely indicates that Lane may (and has expressed an intent to) execute its lien against any recovery by plaintiff in this lawsuit.  Captain D's even took the unusual step of bringing Lane into this action involuntarily as a plaintiff/real party in interest, based upon an argument that Lane, as the insurer, was the proper plaintiff to recover for Foradori's medical expenses.  Lane quite correctly recognized that it had no business being in this lawsuit, and it accordingly requested that it be dismissed from this action so that it could assert its lien when and if plaintiff obtained recovery against Captain D's.  This is the manner in which health insurance providers routinely enforce their liens in countless actions throughout this state and country.  Lane itself has expressly recognized that it is not a proper plaintiff to recover for Foradori's medical expenses, and Captain D's repeated arguments to the contrary, with no citation to authority, border on the frivolous.  This point of error lacks merit.

**Jury instruction issues**

Captain D's next argues that the court's jury instructions wrongly gave the jury the impression that it might validly hold Captain D's liable for Harris' intentional assault. This argument lacks merit. The jury was clearly instructed, and was repeatedly advised during closing arguments, that the two causes of action which it was to consider were for negligent training and negligent supervision against Captain D's. No juror could have imagined that Harris committed either of these negligent acts. Moreover, the jury was clearly instructed regarding the nature of the negligence cause of action, which can not be mistaken with an intentional assault. Captain D's wished for the court to affirmatively instruct the jury that it was not to hold Captain D's liable for Harris' assault, but such an instruction could easily have been mis-interpreted by the jury as a peremptory instruction in favor of Captain D's.

This court had previously held that Captain D's could not be held *vicariously* liable (i.e. without a showing of its own fault) for Harris's assault. Nevertheless, the jury was clearly entitled to conclude that, if Captain D's own negligent failure to supervise Harris foreseeably resulted in his striking Foradori, Captain D's could be held liable. The crucial issue in this context is foreseeability, and the court granted a superseding cause instruction which instructed the jury that:

> [I]f you find from a preponderance of the evidence in this case that the defendant Captain D's, LLC, was negligent in training and/or supervising its employees, but that an independent and unforeseeable act by a third person, namely, an assault on Michael Foradori by Garious Harris, followed defendant's negligent acts and was a substantial factor in causing the plaintiff's injuries, then defendant is not liable for the injuries proximately resulting from the superseding cause, and your verdict shall be for the defendant.

Captain D's repeatedly argues that Garious Harris' attack was an unforeseeable superseding

event, but the jury was provided with a superseding cause instruction which clearly permitted it to accept Captain D's argument in this regard. The jury nevertheless found Captain D's liable, and, as previously explained, this verdict was consistent with the evidence at trial suggesting that Peggy King knew or should have known that her employee was about to engage in a fight (i.e. an intentional assault). This point of error therefore lacks merit.

Captain D's finally argues that the court was somehow obligated to accept the special interrogatories which it prepared, but this argument plainly lacks merit. The court views Captain D's proposed interrogatories as being rather unwieldy and at times misleading,[6] and the use of such interrogatories would not have furthered the jury's consideration of the proof or the presentation of its verdict in any respect. This argument therefore lacks merit.

### III. Damages/remittitur

Foradori comes across as a likeable and sympathetic young man, and the court was, and is, aware of the possibility that the jury, motivated by sympathy, would award a sum in excess of the amount dictated by the evidence. The court therefore (over Captain D's objections) required the jury to specify the exact amounts which it was awarding for each of the major elements of damages in this case. By so doing, the court preserved for itself the opportunity to closely scrutinize the jury's award to determine whether it corresponds to the evidence at trial. As explained *infra*, the court concludes that the jury's award is, in fact, consistent with the evidence

---

[6]For example, Captain D's would have required the jury to make findings of fact regarding whether various individuals "heard and left [the restaurant] on the instructions of Peggy King." The court can not discern how such interrogatories would have assisted the jury in its deliberation or delivery of the verdict.

at trial.

### Past medical expenses

The jury awarded plaintiff $ 1,581,884.41 for the reasonable and necessary medical expenses which he incurred prior to trial.  This verdict corresponded precisely to the testimony and medical records presented at trial, and Captain D's elected not to present any testimony of its own in opposition.  While Captain D's, as noted previously, refused to agree to the authenticity of the medical bills supporting this award, it did not offer a scintilla of proof casting doubt upon the authenticity of these bills.  The court therefore concludes that the evidence at trial supported this award of damages.

### Future medical expenses

The jury awarded plaintiff $8 million for the "**present value** of the reasonable and necessary medical expenses to be incurred by plaintiff in the future."  (emphasis added).  Captain D's argues that the jury did not actually discount the award to present value, but it offers no proof in this regard other than its own speculation.  The court would initially note that it is unaware of any Mississippi Supreme Court authority requiring that awards for future medical expenses be reduced to present value, and Captain D's cites no such authority in its post-trial motion.  It thus appears this is an unsettled issue under Mississippi law.   It does appear that the majority approach nationwide is to require that such reductions be made, and the court accordingly decided to err on the side of Captain D's position and specifically require, in the form of special jury interrogatories, that the jury reduce any award for future medical expenses to present value.

In addition, the court took the unusual step of permitting Captain D's to introduce its own expert Dr. Lee's report, which included his own calculation of future medical expenses reduced to present value, even though Captain D's had elected to rest its case without putting on any testimony of its own.

The effect of the court's ruling was to subject plaintiff's damages expert to cross-examination at trial, while Captain D's was able to submit its expert's report with no cross-examination by plaintiff. It is difficult to discern how this court could have been more accommodating to Captain D's on this issue, and it is surprising that Captain D's seeks a new trial on this basis. Captain D's appears to cite error based upon nothing more than the fact that the jury did not award the precise $6,300.924.00 amount claimed by its expert in his report. In fact, Captain D's asserts in its motion that:

> The jury was presented with two choices for future medical expenses, Plaintiff's unreduced figure of $10,329,567.18 or the present value of that amount, to which Plaintiff's counsel stipulated.

In reality, the jury, as trier of fact, was not required to accept as accurate the estimates set forth in either expert's report or testimony, and it is obvious that it did not do so, considering that its verdict did not correspond to either expert's calculations. This gives the court greater, not less, confidence in the job performed by the jury in this case, which clearly considered the evidence itself without accepting as gospel the arguments of either party. This is not an element of damages about which there is some mathematically "correct" amount; any calculations in this regard inherently involve a large degree of guesswork regarding plaintiff's life expectancy and the amount of medical care which he will require. Captain D's asserts that the jury's verdict was a "compromise" but there is no evidence in support of that assertion, such as if the award had

been the precise difference between the two calculations.

The court would submit that there is every likelihood that the $8 million awarded by the jury actually represents the lower range of medical expenses to be incurred by plaintiff in the future, discounted to present value. The court reaches this conclusion based partly upon the fact that neither party's expert accounted for the effect of inflation on the medical expenses to be incurred by plaintiff in the future.[7]  In *Kinnard v. Martin*, 223 So.2d 300, 302 (Miss. 1969), the Mississippi Supreme Court noted that "hospital and medical expenses have more than doubled" in recent years and held that a jury "has a right to consider any change in the purchase power of money and the cost of living" in awarding damages.  It is thus well settled that Mississippi juries may consider the effect of inflation in assessing damages.

Plaintiff's failure to submit evidence regarding inflation resulted from a pre-trial ruling by Magistrate Judge Davis which struck, on the basis of untimeliness, a supplemental report prepared by plaintiff's expert Dr. Thompson which had calculated plaintiff's future medical expenses while accounting for both inflation and reductions to present value.  Citing a 2005 report from the Council of Economic Advisors,  Dr. Thompson's report notes that medical expenses have grown at an annual rate of 5.72% during the period 1950-2004.  After considering both the effect of inflation and the effect of discounting to present value, Dr. Thompson

---

[7]Based upon this court's review of other cases dealing with this issue,  adjusting future medical expenses for inflation *and* reducing any recovery for such to present value generally results in a net *increase* in any recovery.  This is due to the fact that medical costs are generally accepted as increasing at a rate which exceeds the general inflation rate.  Dr. Lee was not subject to cross-examination on this issue, but it seems clear to this court that this expert either did not account for the effect of inflation in his report, or else he based his calculations on an assumption that plaintiff would require less medical care than plaintiff's expert had testified would be necessary.

calculated plaintiff's future medical expenses at $14,094,086. While plaintiff's inability to present proof of the effect of inflation was due to its own error in failing to timely submit Dr. Thompson's supplemental report, the court, in considering a motion for remittitur, must consider whether the amount awarded by the jury is excessive. The simple reality of the matter is that inflation will play a very significant role in determining the amount of medical expenses to be incurred by plaintiff, and to pretend otherwise would ignore reality.[8]

It is worth noting that, after the completion of plaintiff's case-in-chief, this court (through its staff) notified counsel for Captain D's of the court's intention to direct specific questions to Captain D's damages expert on the issue of future medical expenses. The court intended to ask its own questions regarding the effect of discounting to present value and inflation, in order to address the deficiencies in the proof resulting from the Magistrate Judge's exclusion of Dr. Thompson's report. However, Captain D's elected not to call any wtinesses whatsoever and rested its case on the next court date. While Captain D's was within its rights in not calling any witnesses, the court deems it ironic that Captain D's now seeks a new trial on damages when it deprived this court of the opportunity, which it had specifically requested, to make a more thorough inquiry on the issue of damages during *this* trial. Moreover, Captain D's seeks for this court to accept as gospel the calculations set forth in a written report submitted by an expert whom Captain D's prevented this court from questioning. This would, in the court's view, be improper.

At any rate, the court is of the view that the jury had a right under Mississippi law to

---

[8]The court does not deem it improper to take judicial notice of the fact that this nation has a rapidly aging population which will place great demands upon the very same home care and nursing services which plaintiff will require for the rest of his life.

consider the effect of inflation upon plaintiff's future medical expenses, even without specific expert testimony on this issue. Moreover, even if the effect of inflation was not considered by the jury at all, the court would still conclude that the $8 million awarded by the jury was not contrary to the evidence presented at trial. Even assuming that Dr. Lee's reduction of future medical expenses to present value without accounting for inflation was consistent with Mississippi law (which is in considerable doubt), the jury was still free to conclude that plaintiff would need a greater amount of medical care in the future than that provided for by Dr. Lee. Indeed, plaintiff argued in closing arguments that he would need a greater amount of attendant care than that provided for by Captain D's expert, and the jury may well have accepted its arguments in this regard. Even disregarding inflation, the court does not view an $8 million award as being against the overwhelming weight of the evidence for a young quadriplegic who will require constant care (including assistance urinating and defecating, pain and antidepressant medication, among many others) for the rest of his life. This point of error therefore lacks merit.

**Loss of future earnings**

The jury awarded plaintiff $1,300,000 for the present value of his loss of future earnings. This amount was consistent with the testimony of plaintiff's experts, and Captain D's elected not to present its own expert testimony in this regard. Captain D's argues that this court prevented it from inquiring into family circumstances evidence relevant to future earnings, but this is manifestly not true. As noted previously, this court specifically ruled that:

> The court will permit Captain D's to introduce evidence which might tend to
> establish Foradori's future earning potential (or lack thereof), but the court will
> take care that any such evidence has actual probative value in this regard and that

it is not merely used to "smear" or denigrate the defendant in the eyes of the jury. In light of this ruling, Captain D's needed only make some showing of the relevance of family circumstances evidence to plaintiff's future earnings, apart from merely denigrating the plaintiff, and the court would have permitted that evidence. Instead, Captain D's elected to violate the court's order *in limine* by asking about whether plaintiff had ever run away from home, without first securing a Fed. R. Evid. Rule 403 ruling from this court. The court rightly sustained an objection to this particular question, which clearly does not pass muster under Rule 403.

If Captain D's had wished to ask relevant questions to establish plaintiff's future earnings potential, it had the right to do so under the court's prior ruling, but it did not attempt to do so. Captain D's therefore has no grounds to complain on this issue. Moreover, Captain D's declined to present its own expert testimony regarding plaintiff's future earnings, and it is therefore in a poor position to complain of the $1,300,000 awarded by the jury. Having reviewed the testimony and evidence at trial, the court is of the view that the jury returned a reasonable award for the present value of plaintiff's loss of future earnings, and Captain D's motion for remittitur on this award will therefore be denied.

**Pain and suffering**

The jury awarded plaintiff $10 million for past, present, and future pain and suffering, including loss of enjoyment of life. The court can not conclude that this award, which was a fraction of the $45 million requested by counsel for plaintiff for pain and suffering, was against the weight of the evidence. It seems clear that Foradori has had to endure an extraordinary amount of suffering in his young life, even by the standards of quadriplegics. Once an active and

athletic individual, Foradori now has only minimal and spastic use of his upper extremities. He is unable to perform basic tasks of self-care, and he relies upon assistance to get out of bed, urinate, and defecate.

Cruelly, Foradori also suffers physical pain in addition to his disability, for which he must take Neurontin, a powerful analgesic. Foradori does not enjoy the level of family support enjoyed by many quadriplegics. Foradori's father works two jobs, and while he initially made efforts to perform those jobs and still care for his son, the physical and mental demands of such became too great. As a result, Foradori was forced to move to a nursing home, which is clearly a great emotional burden for a young man. While the jury's award in this case would eventually permit Foradori to buy a handicapped-accessible home and obtain some measure of independence and dignity, he does not presently enjoy such comforts. In light of the foregoing, the court does not view the jury's award of $10 million for past, present and future pain and suffering, including loss of enjoyment of life, to be excessive.

### Conclusion

This was an extraordinarily hotly contested trial, and it continues to be so. While the court dismissed most of plaintiff's claims prior to trial, it remains of the view that the jury's verdict finding Captain D's to have been negligent was supported by the evidence. The jury returned a very large verdict, and the court takes seriously its duty to scrutinize the verdict in this case. The court would not hesitate to grant a remittitur if it felt that such was supported by the evidence, but, for the reasons previously cited, the court concludes that the jury's verdict on each of the four major elements of damages was supported by the evidence at trial.

In light of the foregoing, the court concludes that Captain D's motion [530-1] for new

trial, remittitur, and/or judgment as a matter of law is not well taken and should be denied.

SO ORDERED, this the 6th day of December, 2005.

    /s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**